Good afternoon. May it please the court, counsel. My name is David Anthony. I represent the petitioner-appellant Donald William Sherman. I would like to reserve five minutes for rebuttal. The district court certified one issue for review before this court concerning the denial of Mr. Sherman's right to present a defense to the charges against him. This court also ordered supplemental briefing on several other claims, and these claims have a lot of arguments in common. Arguments of trial court error, arguments of prosecutorial misconduct, and arguments of ineffective assistance of counsel. The errors that have been briefed in the case extend to the voir dire, the trial phase, and also to the sentencing hearing. As far as the issue that the court certified for review regarding Mr. Sherman's right to present a defense, the state's case for premeditation here was based on a theory that the killing was a premeditated murder committed in retaliation against Diane Bauer as the result of her breaking off her relationship with Mr. Sherman. The state's case was based on numerous falsehoods, and it was also based on the admission of improperly admitted evidence. As far as the falsehoods, the state's theory depended upon the fact that Diane maintained a loving father-daughter relationship with Lester, even after Lester caught her stealing money from him. The truth of the matter is, Diane was advised by her own attorney that she lost no consortium as the result of her father's death. The state argued that Lester forgave Diane for stealing the money. The truth is that Lester was making arrangements at the time of his death to exclude Diane from inheriting from him, but he was killed before that happened. So, counsel, I understand your argument, I believe. I understand what you're suggesting with the evidence that was excluded. But what I don't understand is how that affected Mr. Sherman's ability to prevent his, excuse me, to present a defense. Because it seems if the evidence were admitted that Ms. Bauer, Diane Bauer, wanted her father killed and had controlled or influenced Mr. Sherman to commit the murder, that would provide additional evidence of premeditation, that he planned a murder with her in advance of going to Las Vegas and killing Dr. Bauer. So I'm having a hard time understanding how the exclusion of the evidence affected his ability to present a defense. Yes, Your Honor. During the motion in Limine hearing, trial counsel made a proffer to the trial court of how this would have supported a theory of defense for Mr. Sherman. The proffer that trial counsel made was that if the evidence had been permitted, they would have been allowed to put on their expert, Dr. Patel. And what they proffered is that if allowed to testify, if there was a foundation for Dr. Patel to testify, that Dr. Patel would have testified that Mr. Sherman was not capable of planned action due to the fact that he was suffering from acute psychosis as the result of methamphetamine intoxication. Okay. So I've seen that argument in your brief, but what I didn't see was any explanation of what foundation was missing, what Dr. Patel needed in addition to the information that he had. What Dr. Patel needed, and I believe what trial counsel stated in the Limine hearing, is that he needed a foundation as it concerned Diane Bauer making statements in Mr. Sherman's presence and in the presence of others about hating her father, about wanting him dead. The trial counsel, when they proffered this to the court, that was the foundation that was missing. And what they told the trial court was that without that foundation, they could not put their expert up on the stand because that was a necessary component for his testimony. But didn't Dr. Patel testify at the penalty phase that Mr. Sherman told him the specifics of the crime, what had occurred that day in Las Vegas? He went to Dr. Bauer's house, became angry, left, returned several hours later, et cetera, and went through the details of the murder. So it seems that the real problem is that the defendant wanted to present the defense that he didn't commit the crime. But if you put on Dr. Patel, Dr. Patel's testimony would include the admissions from the defendant that he did commit the crime. So that leads me back to how does this prevent the defense? Because I can see counsel making a strategic decision not to put on Dr. Patel in the guilt phase, but that doesn't mean that Mr. Sherman couldn't present his defense. Your Honor, I think that the question that you're asking makes a very, very important point, which is that what trial counsel said in both of the declarations that were obtained after trial is that they found themselves in a conundrum exactly as the court described, which was because their case in chief. And what it forced them to do was to put on an alternative type defense. And so what they ended up arguing to the jury, because their evidence wasn't permitted, was two arguments. Number one, that Mr. Sherman didn't commit the offense. And number two, if he did, then he didn't have the requisite level of intent. So to answer the Court's question directly, the way that the trial counsel explained this was if they had the foundation, if they had been allowed to present that evidence, we wouldn't be facing a situation where they presented alternative defenses to the jury. Roberts. I have two questions. So the motion to eliminate did not expressly exclude Dr. Patel's testimony. It was a defense choice, correct? I think it excluded parts of Dr. Patel's testimony. Part of Dr. Patel's testimony was laying the foundation for why he was able to draw conclusions about what — So that's my second question. Experts are allowed to testify over things that are not admitted in court all the time. That's the whole point of why we have expert testimony. So I don't understand why Mr. Sherman could not have presented the expert testimony if there is objection to foundation. Maybe that might be an issue, but I don't see any reason why he couldn't testify at all unto any hearsay evidence he's aware of. You know, and then the objection has to be drawn, and that's a different question. But it seems like you, you know, Mr. Sherman unilaterally disarmed for no reason. Well, Your Honor, we both have the same record before us about what was going on in the eliminate hearing. The only thing that I can say is the way that trial counsel explained it, which was without the foundation, without the witness testimony, that their expert was simply not willing to be able to get up onto the stand at that point in the trial. But just as a matter of expert witnesses, that doesn't sound right to me, unless I'm missing something. Well, I guess kind of thinking this issue through, part of the credibility of an expert relies upon the data that they have at hand. Right. And I guess the way that this would play out is that without that foundation, it would be limiting as far as what his testimony or the validity of what his conclusions could be. Now, that's, again, what they put on the record. That's what they argued to the trial court. There's nothing in the record that disputes or pushes back on that notion, but that seems to be the justification that they used. The other thing that I would add, Your Honor, because we talked about how there are overlapping claims here, is that we have also asserted a claim of ineffective assistance of trial counsel. And, again, that claim relates to some of the issues the court is discussing, which is having a properly prepared expert. Now, one of the things that we can see from the record is that when Dr. Patel testified, his preparation occurred very close in time to the start of trial. There wasn't the time available to do the things that he requested that counsel do to help him form his opinion. And so getting to the court's question about when, you know, why couldn't he testify, it's also the case that if he wasn't properly prepared beforehand, if he didn't have the witness information, if he hadn't done the witness interviews, then that's another reason why there could be a relationship here between the ineffective assistance of counsel argument and the argument about trial court error. But didn't Dr. Patel have... Counsel. I'm sorry. Go ahead, Judge. Judge Gould, with one question for you. You've said what was argued at the motion of limine. But is there an affidavit in the record from the expert witness saying that he was unable to testify on this basis? Your Honor, there is not a declaration or an affidavit from Dr. Patel as to this issue. If there's no declaration, how can we just accept, like, an argument by you about what you infer? Well, it... Hearing. I'm sorry. I didn't mean to cut you off. I don't think it's simply a matter of what I'm inferring, Your Honor. We have a couple pieces of evidence. We have, first of all, the colloquy that occurred on the motion in limine hearing. And the other thing that we have is we have the declarations from trial counsel, from David Sheik and from Nancy Lemke. I believe in their declarations they discuss how the effect of the trial court's ruling was so severe that it basically threw off including, at least from their own perception, their ability to have their expert prepared with a foundation to testify. So while we don't have a declaration from Dr. Patel, we do have a declaration from both trial counsel. Well, I sort of share, at least preliminarily, share the concern expressed by Judge Bumate that experts often can testify, you know, based on assumed facts or other circumstances. And so it's a little hard for me to understand why the expert could not. Well, getting back to the question from Judge Bumate, when we talk about assumed facts, we have facts that aren't in evidence at this point. And for whatever reason, in the discussions that trial counsel had with their expert, they believed or they were informed by the expert that that was going to be an impediment for them to be able to put him on the stand in the guilt phase. The other thing that I would say about this, just since we're having this discussion, is that as we sit here in this procedural posture, there hasn't been any evidentiary development permitted, and that these are, I think, appropriate areas to explore at a hearing. We would ask that the court consider that and to remand this back so we could have that hearing, because then we could sort these issues out and the federal court could be in a position to make a reliable determination. Did you request additional discovery before the district court? And if you did and the district court denied that, did you request a certificate of appealability on that issue? At the point that we had gotten a certificate of appealability, it was on the issue about the right to present a defense. My understanding of a certificate of appealability is it applies to issues. Once you get an issue, like denial of the right to present a defense, at least my understanding of the law regarding COAs is that that would include subsidiary issues, such as the denial of discovery, the denial of an evidentiary hearing, procedural default issues. My understanding is that those are all fair game. And also, just to answer the court's question, the procedure in the District of Nevada is that the district court enters its final order in judgment, and unlike other jurisdictions, we are not heard, the defense is not heard before that final judgment is entered where the court determines on its own what it would or wouldn't grant a COA on. So before that final judgment happens, that we didn't really have an opportunity to press a special case for some sort of a subsidiary issue regarding what the court granted a COA on. My understanding, and I don't think that I'm wrong on this, is that once you get a COA on a claim, right to present a defense, that would necessarily include other issues related to that claim, such as the denial of formal discovery, which we did request, I think three times in this case, requests for formal discovery. So what is it that you think you would uncover through discovery? Well, as I'm thinking about the motion, one of the biggest issues that I think has not been explored but should be is the issue about the state's failure to provide or to disclose material exculpatory and impeachment evidence concerning, number one, the issue with Diane Bauer, and number two, with respect to the issue of the jailhouse informant witnesses who testified at the penalty hearing. So I know that a lot of our formal discovery was directed in that direction. And so I think, and again, coming back to where we started from, I believe that a lot of these issues about trial court error actually fits very synergistically with these issues of prosecutorial misconduct because they're all related. For example, if we had disclosure of the Longview Police Department report, that could have been something that Dr. Patel would have found very important, right? Because before we get into these other issues, can I ask one more question on the exclusion of the motion to eliminate? Can I ask a standard review question? So you argued that the Nevada Supreme Court didn't reach the constitutional question and based its decision solely on the State law question, correct? But it did then go on to do a harmless error analysis. So if we would agree with you that they didn't reach the constitutional question and our review should be de novo on the constitutional question, what about the harmless error analysis? Do we do de novo, or is that — does that get AEDPA deference? I would argue, Your Honor, that that is reviewed de novo by the Court. The reason that I would say that is because if the State court was merely addressing a question of evidentiary law, that would affect not only the decision, but also the issue of state law, because there's a different standard there if we're talking about mere evidentiary error. So, for example, if you look at the decision, the decision talks in terms of manifest error or manifestly wrong. Those are the types of words that the Nevada Supreme Court often uses when they're talking about an issue of State law evidentiary error. So my argument, Your Honor, would be similar to the question of whether they addressed the constitutional issue. I would argue that the harmless error part was also subject to de novo review by this Court. But if they found it harmless under evidentiary issues, what would be the difference under a constitutional harmless error? Well, they wouldn't be applying Chapman v. California in that circumstance, Your Honor. Okay. So the Nevada Supreme Court concluded that any error was harmless because the defense was able to put on this theory in closing argument and cross-examined Diane Bauer on all these points. Why is that unreasonable? It's unreasonable, Your Honor, because what they were basically left with was Mr. Sherman's confessions. And what we can see when we look at the record is that the prosecution was able to make short work of those. The prosecution was able to argue very effectively that Mr. Sherman's two confessions were self-interested. There's always an assumption that what the defendant offers in his own confession is selfish and self-interested. And so the other thing, Your Honor, looking closely at Mr. Rogers' closing argument, is that he dismisses Mr. Sherman's explanation out of hand, and he says, what evidence is there to support this type of a defense? And that's precisely because everyone, you know, inherently questions the good faith and the veracity of the defendant during his confessions. And so what the defense was left with was very little. Two confessions, arguing Mr. Sherman, explaining to John McCoy and to Joe Holbert why he did what he did, and that was all they that was what they had to work with. And we can see from the prosecutor's closing argument how they eviscerated that position. There was no evidence to prove it other than his self-serving confession. So my argument, Your Honor, for why this would be unreasonable is because, I mean, first of all, the other thing we haven't talked about is the argument itself. Juries in Nevada, just like everywhere else, are instructed that the arguments of counsel are not evidence. In fact, the trial court doesn't even give the jury their notebooks to take notes during argument. That's the way that the court was instructing the jury about the arguments themselves. So if all we're talking about is two self-serving confessions, or what appear to be that, and we're talking about argument, that doesn't really offer a substitute for actual live witness testimony, particularly when we're talking about, for example, this issue with the Alaska Highway incident. The defense proffers a percipient witness, Katie Cox. Katie's going to testify that what Diane said for the first time at trial, that Mr. Sherman pulled up next to her in a vehicle and looked at her and made a finger like a gun, that that wasn't something that really happened. And so when I look at the ---- Roberts. How does that fit into your theory of motive? That seems like pure impeachment to me. Some of the other stuff I could see being more motive, but that seems just pure impeachment. Well, Your Honor, I think that the reason that that is more than an impeachment and the reason that it was explained as such is because that was the flashpoint. That was the ---- according to the State, that was the final interaction between Diane Bauer and Don Sherman. That was the motive right there. And it was the making of a gun, the threat that's implied by making a gun with your fingers, that they used that to say this was a retaliation murder. And that was the point that proved it. Oh, I see. And so the issue wasn't per se, Your Honor, to impeach Diane Bauer and her credibility. And the proof for that, Your Honor, is once the defense moves for a mistrial, what does the prosecutor argue? The prosecutor says, and I think I've got it in quotes somewhere, but he says we have to do this. This supports our theory of retaliation. So, again, it's more than impeachment, I believe, Your Honor. Okay. And then so even accepting your theory that it's not retaliation, I'm not quite sure I understand how it negates any element. You know, taking Mr. Sherman's story, it's true that, you know, Diane was abused, that he didn't ---- that there was not a loving relationship. And all it seems to suggest is that Diane might be in on it versus anything else. It doesn't negate premeditation or anything else. Well, Your Honor, I think that that comes back to the testimony of Dr. Patel. I think that comes back to the testimony about what the effects are of methamphetamine intoxication. Because what does Dr. Patel say? Dr. Patel says that when individuals are progressively ingesting more methamphetamine and not sleeping, one of the things it triggers is this idea of magical thinking, this idea that you can conquer any problem, this idea that you can repair anything if you just put your mind to it. And the way that Dr. Patel explained it was the issue when Mr. Sherman was coming down to Las Vegas was not to kill Lester Bauer. It was to confront him and repair his relationship with Diane. That's the way that Dr. Patel explained it. I'm not sure Dr. Patel came back later and killed him. Again, obviously, we all have the facts themselves, the way that entry was effectuated into the property. But, I mean, on the one hand, Your Honor, I would acknowledge that this certainly isn't a sufficiency of the evidence case. I'm not arguing under Jackson v. Virginia that there's not sufficient evidence. But at the same time, there was enough evidence to submit to the jury the question of whether this was warranted from the evidence. So the murder occurred at the end of May 1994, May 29th or 30th, that period of time. This encounter on the highway in Alaska was sometime in April, so a month or so before, maybe six weeks. And Diane Bauer and Mr. Sherman ended their relationship sometime in late 1993. So this effects of methamphetamine and magical thinking would have had to have been in effect with Mr. Sherman for several months after he ended his relationship, say six months after his relationship ended with Ms. Bauer. It brings me back to my original question is, I don't understand how this would have advanced Mr. Sherman's defense, how he could have convinced the jury that six months after he was lost in a relationship with this woman, he was still somehow under her sway, and that made him unable to premeditate a murder. Well, Your Honor, just to clarify based on the time frame, I think the time frame is a little bit tighter than that. The time frame, as I recall it, was, based on the evidence at trial, was that the parting was around the end of January, Super Bowl Sunday in January of 1994. Five months. Five months is still a pretty long time. So what I would say is that, yes, that's a long time, but what's important is if this issue about Mr. Sherman making a gun with his fingers, if that isn't true, then it does tend to push back or repel this idea that this was a highly premeditated retaliation murder. I see I'm getting to my five minutes. I do want to cut into it just a little bit because I want to just mention that I also want to point out the issue about the trial court's comments during voir dire. I think it was very inappropriate for the trial court, for a public magistrate, to tell members of the public what their religion believes. I think religion is very personal to each of us, and that it was not an appropriate thing to insert into voir dire, and I think that extraneous factor is something this court should consider when it considers the harm in this case. Did the judge insert that, or did the potential members of the jury insert that issue? We all have the voir dire in front of us. I'm going to say it was the judge, Your Honor. And the reason what... I'm sorry, and none of those jurors were seated? The two jurors that had the back and forth with the judge were not seated. What was the outcome? What does that telegraph to the jurors? That telegraphs to them that if you identify as a Christian and you have qualms about the death of your responsibility as a citizen in Nevada, I think that's very offensive. I think that's extraneous. Thank you, unless there are any other questions. No, thank you. I'm sorry, I assumed that. Okay. Ms. Proctor. Thank you, Your Honors. May it please the Court, my name is Heather Proctor, and I have the honor to represent the respondents in this matter. To begin with, with the one certified issue, which is regarding this motion in limine. The entire point of introducing this evidence was to show that Diane Bauer had a motive to commit murder and to have her father murdered. That did not demonstrate that, excuse me, that Sherman did not have the premeditated and deliberate mindset to commit that murder. As was noted, his entire mindset and entire argument during this motion in limine was how Mr. Sherman decided to get to Las Vegas. He wanted to confront Dr. Bauer regarding these allegations and to, again, reunite Diane and her father. However, this did not happen. He left, he took a lot of drugs, this was before the jury, and he returned. He broke into this home. He tried several ways to break into this home, and with a hammer, he bludgeoned this gentleman to death. Diane, anything regarding Diane and her motives were not in question before this jury. Well, the problem is the government put motive at issue, and they had a theory of motive that Mr. Sherman was doing this to retaliate against Diane. And it does suggest that, you know, this countermotive does suggest that Diane was complicit versus it being retaliatory. Why can't Mr. Sherman say the government's theory of motive is wrong? You know, maybe it doesn't fully exonerate me, but they're wrong about this, so, you know, jury, what else is the government wrong about? The problem was Diane was never on trial. It was Mr. Sherman. Sure, but the government put on a motive for Mr. Sherman that Mr. Sherman is contestant. So why, you know, why can't Mr. Sherman do that? Your Honor, there is clearly established U.S. Supreme Court precedent that dictates that a defendant is not free to introduce every piece of evidence that he wishes. It is necessarily restrained. And in this particular case, it was restrained because the court relied on well-established evidentiary rules that you cannot introduce specific extrinsic evidence to address a witness's credibility or truthfulness. In this case, and under Nevada law for Nevada's ‑‑ excuse me, Nevada rules of order by statute 50.085, there are ways to introduce this evidence. The defendants were able to thoroughly cross-examine Diane regarding these instances. Yeah. I guess to me it's just a thin line between impeachment and introducing a counter motive here. And so I agree with you on impeachment. If it's clearly impeachment, then that's totally fine. But if it's introducing evidence of a counter motive, it seems like that might violate the Constitution. Your Honor, even if this ‑‑ first of all, if this evidence was introduced, as was suggested earlier, it rather enforced the idea that this was a premeditated murder, that he had reason to do this. It doesn't really ‑‑ I mean, that goes to harmlessness in my view. It's just even if you agree with his motive, it doesn't save him. It's just a question of defense, whether or not he should have been allowed to introduce it. Yes, Your Honor. And the State's theory was that this was for revenge. At most, if this evidence was introduced, it would address why Mr. Sherman went to Dr. Bauer's house in the first place. Was it for revenge or was it for these heroic fantasies that he had before him? That is where it ends. And that is where the State's revenge idea actually starts to end as well. The whole question was why did he actually kill Dr. Bauer? That was not because he was under the influence of Diane. He did what he wanted to do with regard to Diane, which was he wanted to confront Dr. Bauer. And he did so. That ended anything that had to do with Diane. That ended anything that had to do with undermining the State's revenge theory because he then went away and then he took great deal of drugs and then he came back. Well, that wasn't in the State's evidence. That was, I thought, Dr. Patel's evidence on the penalty phase. That is correct, Your Honor. But he did confess to the police that he intended originally to simply confront Dr. Bauer with these abuse allegations. And then everything went crazy and it went out of control. He told the police that. And so he acknowledged this was his original intent was to simply confront Dr. Bauer. Was that in the government's case in chief, that fact? Yes, Your Honor. I believe it was regarding his confessions to the police. So I have some – I'm sorry, go ahead, Judge. Counsel, I have a procedural question, please. That issue in this case is in part the scope of cross-examination permitted of a witness. And if we normally review such evidence issues for abuse of discretion, how do we review in this case? Is it de novo review or is it under the AEDPA? Because it was a state law case. Your Honor, my argument is that this is still under the AEDPA review, primarily because the Nevada Supreme Court did rely entirely on state court law. But that was consistent with both Crane and Holmes, that a court can rely on its own evidentiary rules in order to determine whether this evidence was properly admitted and whether this evidence or the court's actions impacted the defendant's right to present a defense. So our argument is it is entitled to AEDPA deference. Then what would be the precise question that you say would be subject to AEDPA deference? The question, if I understand your question, Your Honor, was was the Nevada Supreme Court properly relying on well-established evidentiary rules based on a legitimate purpose to prevent introduction of this evidence? And the answer is yes, they did. And they relied on the Nevada Revised Statutes in order to concern, to block this evidence based on a concern that it would needlessly confuse and mislead the jury. So are you agreeing that the Nevada Supreme Court did not adjudicate the federal constitutional claim, that he was prevented from presenting his defense? I disagree, Your Honor. While the Nevada Supreme Court solely relied on state evidence, they are not required to cite a U.S. constitutional mandate. By relying on that state evidentiary rule, they did address his constitutional question as to whether he had a right to present a defense. They addressed it in terms of that evidentiary rule. And that was consistent with both Crane and Holmes, that as long as the State District Court is relying on that well-established evidentiary rule with a legitimate purpose, then they are permitted to proceed, and it is not a violation of the defendant's right to present a defense. What's the basis of that, that if you're adjudicating under a state rule, you're presumptively deciding that it's not unconstitutional because you wouldn't find your state rules unconstitutional? What's the analysis to get there? Your Honor, when you look at both Crane and Holmes, they address whether a court can rely on their own evidentiary rules in establishing whether there is a constitutional violation of the defendant's right to present a defense. That is precisely what happened here. But even if we go beyond that, the question, even under DeNoble review, Mr. Sherman simply does not prevail in this case. He cannot show that this evidence was necessary. And as far as Dr. Patel, Dr. Patel testified at the penalty hearing that according to Sherman, he went away, he took drugs, and he returned in a rational rage to kill Dr. Bauer. Can I ask a question about that? So say we disagreed with you, but the state court did not consider the federal claim, but it did go on to do harmless error. Is that under AEDPA deference, or is that under DeNoble review? My position would be it would be under AEDPA deference. So you could split the legal question and the harmless error question? Yes, Your Honor. Is there a case that says that? I just don't know if I've seen that. That has been established. I can't give you a case off the top of my head where if the court has addressed one aspect under an AEDPA standard or constitutional standard, you can review that standard under AEDPA, even though you do the other one DeNoble. Going back to Dr. Patel, there was no ineffective assistance in this case. In fact, at one point Dr. Patel testified regarding the evidence that was not given to him or he had asked for. Defense counsel actually asked him if he wanted the evaluations of three separate mental health experts that they had obtained before they retained Dr. Patel, and he said no. Well, what about the ineffectiveness of deciding not to put Dr. Patel on the stand in the guilt phase? Your Honor, once again— Because you would agree with me, right, that Dr. Patel could have testified to any of this. Absolutely. And so the fact that it was excluded is no reason to not have Dr. Patel testify. So why is that not ineffective? Your Honor— If they believe that, that seems ineffective. Yes, Your Honor. According to Ms. Lemke, who was one of the defense counsel, she put on the record that Dr. Patel did not feel that there was sufficient foundation for him to testify. I don't know— Isn't that almost ineffective in itself, then? Why would a lawyer defer to a non-lawyer on what the legal rights are of an expert witness are? That just seems odd. Your Honor, even if Dr. Patel had testified, it would not have altered the outcome of this trial. Ms. Murphy— Yeah, that's the prejudice prong. I'm just saying the deficiency prong. Yes, Your Honor. As to deficiency, they did introduce Ms. Murphy, who testified regarding the effects of methamphetamine on an individual. So she was able to testify regarding that aspect. I believe they also presented other evidence regarding individuals who were familiar with Sherman and his meth use during the guilt phase. So this evidence was before the jury, but it did not decrease his premeditation and deliberation in this action. So when you say they presented the evidence from Ms. Murphy, Ms. Murphy was a friend, right? She wasn't a medical professional who could offer opinions about the magical thinking and the effects of methamphetamine. That is correct, Your Honor. She was actually originally Diane's friend and then testified in support of Mr. Sherman. But she testified from her own personal perspective of how methamphetamine does impact an individual. She certainly was not an expert, but the jury did hear about these effects, and they did make a determination that he still was able to premeditate and deliberate this murder. So opposing counsel raised the issue of the voir dire during the penalty phase and the judge's comments with respect to capital punishment in the Bible. I assume he's going to come back to that. How do you respond to their arguments that counsel was ineffective for failing to challenge the voir dire? Yes, Your Honor. Our position, of course, is that counsel was not ineffective. And, in fact, we disagree with the Nevada Supreme Court that found these comments were inappropriate. They did not specifically find that they were unconstitutional. They found that they were appropriate. It was a matter of first impression for the state, and they compared it to Sandoval. The problem is this is completely distinguishable from Sandoval. In Sandoval, it was a prosecutor during closing argument who went off on a tirade about how religion impacted the death penalty and how the jury should impose a death penalty. In this case, it was a state district court during voir dire that they were working under their constitutional requirement to ensure that this jury could follow the instructions, including that they could equally consider all three punishments, including the death penalty. It was Ms. McPherson. It was Ms. Brown who specifically raised their own religious concerns as to imposition of the death penalty. The court simply responded with three questions, one to Ms. McPherson and two to Ms. Brown. And contrary to Mr. Sherman's argument, this did not impact the rest of the jury panel. The court did question Ms. McPherson. She at one point said, I pay, I understand. And then she finally said, my religion will not allow me to do this. And she was excused for cause. But that did not impose any kind of restrictions on the panel. Ms. Brown shortly thereafter imposed or noted her own concerns regarding religion and the death penalty. And she was even more adamant than Ms. McPherson. And the court asked her two questions, and it was quite clear that she could compensate. Wasn't there another juror that referenced the district court's, the trial court's reference of religion? Yes, Your Honor. The next day, there was a Baptist minister. Right. And he did mention that he. So, I mean, it does suggest that the jurors were listening and it kind of painted how they thought about the case. With all respect, I disagree, Your Honor. It does show that the jurors were listening. But it did not show that the court's comments, which were two or three very short comments, impacted any other prospective juror to raise their religious beliefs. Mr. Griffiths, again, raised his own religious beliefs, stating that I am a Baptist minister, I see nothing wrong with the death penalty, and I actually agree with the court. So, I guess, can you say why it's appropriate for a district court to be engaging on religious matters? You're disagreeing with the Nevada Supreme Court that said it's inappropriate. So why is it appropriate? Your Honor, it's only appropriate to the extent that the court was addressing the jurors' concerns because the court had a duty under Wainwright v. Witt and under Morgan to ensure that these jurors could consider all three forms of punishment. The court did not go on a long diatribe regarding the religion. They simply addressed these individual jurors' concerns. The court itself suggested it might not be appropriate for, I don't know, him or her to say it, right? Your Honor, the court did say, you know, you have a death penalty in the Bible. That was not supporting the death penalty. That was not insinuating the court's religious beliefs on the prospective jurors. It was addressing those questions. To not address those questions would suggest that these individuals would be able to raise concerns regarding religion and no one would be able to question whether that was a basis to excuse for cause. It would suggest that any time a prospective juror raises a question as to their religious beliefs against the death penalty, they must automatically be excused for cause. And that's simply not established in the U.S. Supreme Court precedent. Bottom line, even if it is inappropriate, there is no clearly established law saying that it's unconstitutional. That is correct, Your Honor. And, as noted, none of these individuals were actually seated on the final jury. The court has questions on any of these other matters. I'm good. Thank you. I'd like to start with the issue about the trial court's comments during voir dire. The first thing that I would like to note is that, and, again, I might have misheard counsel, but the Nevada Supreme Court found that the comments were inappropriate, not appropriate. So I just want the record to reflect that. The other thing that I want to note is that the disqualification questions of McPherson and Brown had nothing to do with whether Christians believed that the death penalty is required for murder in the Old Testament, in the Book of Judges. Those were not the disqualifying questions that led to their excusal. So it wasn't necessary for the court to get into that area. What I would also note is that Judge Bumate had asked about clearly established law, but if we're talking about an ineffective assistance claim, then the clearly established law is Strickland v. Washington. And the issue is if counsel had made a contemporaneous objection, it would have given rise to a meritorious motion for mistrial. And so I believe that we can show prejudice under Strickland because Strickland prejudice doesn't need to be itself a clearly established Federal law claim. And the other thing that I would say is that it's — I think it's odd to have the State stand up to the Court and say we shouldn't look at what the State court did or what the State court ruled. I don't really think that this Court's review right now concerns whether the State disagrees with the Nevada Supreme Court. I don't think that that's not the way the case comes to the Court. And so I would also push back on the notion that we can re-engineer the Nevada Supreme Court's decision about whether these comments were appropriate or not. With respect to — I had a couple comments about counsel's arguments regarding AEDPA review. One of them is that I would push back on this notion that any time a State court addresses an evidentiary ruling, that necessarily also means that the Court is addressing a Federal constitutional claim. I don't think that that's a conclusion that this Court could draw. Certainly not a conclusion it could draw from any Federal law that I'm aware of. The authority on this point is Harrington v. Richter and Johnson v. Williams. And reviewing Johnson again late last night, it requires that the courts carefully look at the decision of the State Supreme Court to see if there is indicia upon which we could rebut the presumption that there was a merits review. I believe that based on the State's concession that this was only addressed as an evidentiary ruling, I think that we have rebutted the presumption provided in Johnson. And I don't think that there is any basis for the Court to conclude that merely addressing evidentiary law also necessarily means that a Federal constitutional issue was decided. The other thing that I would add is that there were questions, again, about harmless air and whether that is something we should defer to. What I had said originally was that the standard of review for harmlessness when we're talking about non-constitutional air is not Chapman v. California. If we're looking at that, mere evidentiary air has a couple components. Number one, they defer to the trial court about whether there was manifest air. That's not Chapman. And they also have a statute similar to Federal law that's talking about a substantial and injurious effect. Substantial and injurious effect is not Chapman. And so for those reasons, I believe that both the issue of the constitutional violation and the issue of harmlessness are both issues that this Court should decide de novo. Thank you. And if the Court doesn't have any more questions. Kagan. Thank you. This case is taken under submission. And, Counsel, thank you both for your arguments this afternoon. They were very helpful. And we are adjourned.
judges: GOULD, BADE, BUMATAY